UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | CAUSE NO.: 1:16-CR-28-TLS |
| | ) | |
| MICHAEL PALMER, | ) | |

**OPINION AND ORDER**

The Defendant, Michael Palmer, has pled guilty to violating 18 U.S.C. § 922(g)(9) for possession of a firearm while classified as a prohibited person. An officer with the United States Probation Office prepared a Presentence Investigation Report (PSR) in anticipation of the Defendant's sentencing. The Final PSR [ECF No. 34] included two enhancements: a four-level enhancement, pursuant to U.S.S.G. § 2K2.1(b)(5), for the Defendant having "engaged in the trafficking of firearms," and a two-level enhancement, pursuant to U.S.S.G. § 2K2.1(b)(4)(A), for the firearms having been stolen. The Defendant objects to the inclusion of both enhancements in the PSR, arguing that the facts do not show that the Defendant engaged in a conspiracy to traffic firearms or that the firearms were stolen.[1] If the Court determines that the enhancements are properly applied, then the adjusted offense level should be 28, and the total offense level should be 25. If the Court determines that either or both of the enhancements are not properly applied, then the United States Probation Office must revise the adjusted offense level downward.

**BACKGROUND**

---

[1] The Defendant's remaining Objections [ECF No. 32] to the PSR were resolved by the probation officer's revisions to the PSR and noted in the Addendum [ECF No. 35].

The following is based largely on the evidence presented at the Evidentiary Hearing [ECF No. 40] held on April 19, 2017. The Defendant met Sie Merriman around August 2015. After being acquainted for only two months, the Defendant "purchased a 1962 Chevrolet Impala from [Merriman], [and] paid him approximately $2,000." (Apr. 19, 2017 Hr'g Tr. 7:7–9, ECF No. 43.) However, "when it came time to get the title and the car, [Merriman] did not produce" the car and gave the Defendant a defective title, which, because it "had white out on it," prevented the Bureau of Motor Vehicles from transferring title into the Defendant's name. (*Id.* at 7:7–9, 7:22–23.) The Defendant asked for his money back on multiple occasions, but, instead of returning the Defendant's cash payment, Merriman suggested "purchasing things instead of just handing [the Defendant's] money" back to him. (*Id.* at 8:14–15.) The Defendant agreed to Merriman's proposal "just because [he] was out money and [he] just wanted something—the money or something of that value to replace what [he] had lost." (*Id.* at 10:17–21.)

Eventually, Merriman suggested purchasing firearms that were worth approximately $1,800 to satisfy his debt. (*See id.* at 32:12–18.)[2] At the time of this proposal, the Defendant had a prior misdemeanor conviction and, unbeknownst to the Defendant at the time, Merriman had a prior felony conviction, which meant that neither could legally purchase the firearms on their own.[3] Consequently, Merriman suggested that they convince Kristal Hiner, the Defendant's significant other, to purchase the firearms, and the Defendant did not question this suggestion. (*See id.* at 18:9–12.)

---

[2] The Defendant suggested during his cross-examination testimony that Merriman "kept pressuring [him]" to receive repayment for the $2,000 debt specifically in the form of firearms. (*Id.* at 39:16–18.)

[3] The Defendant stated that "sometime around Christmas of 2015," a mutual friend of the Defendant and Merriman told the Defendant that Merriman "had been to prison," but did not say why he had been there, whether he had a prior felony or misdemeanor conviction, or whether he was prohibited from possessing firearms as a result of his having been in prison. (*See id.* at 12:3–13:2.) The Defendant merely "assumed" that Merriman had a felony conviction. (*Id.*)

2

On December 4, 2015, the Defendant, Hiner, and Merriman went to two firearms sellers in Fort Wayne and purchased a total of five firearms.[4] Hiner was listed as the owner for each firearm, and Merriman paid for the firearms with checks, which "he told [the Defendant were] company check[s]." (*Id.* at 14:7.) The Defendant knew nothing about Merriman's "company," did not see the checks that Merriman wrote out, did not "participat[e] in writing out the check[s] or giving [them] to the employee[s] at the store[s]," and did not otherwise have any knowledge that Merriman wrote the checks on a closed account. (*See id.* at 14:12–16:9.) The five firearms were taken to the Defendant's home that evening.

Although the Defendant's relationship with Merriman was limited to the car sale and subsequent firearm purchase, Merriman stayed at the Defendant's home that night. (*Id.* at 20: 8–10.) The next day, the Defendant and Hiner also agreed to drive Merriman to Kentucky to "see his baby mother and his daughter." (*Id.* at 19:11–12.) Despite his previous attempt to sell to the Defendant a 1962 Chevrolet Impala, Merriman claimed that he did not own a vehicle and needed transportation. There had not been any prior discussion of such transportation. Because the Defendant thought that the firearms purchase satisfied Merriman's obligations for the Impala, he agreed to the trip only because "he felt sorry for [Merriman]." (*See id.* at 24:11–16.)

During the drive to Kentucky, the Defendant assumed that all of the firearms were left in Indiana, but when the Defendant stopped at a gas station, he noticed that Merriman was carrying one of the purchased firearms. The Defendant and Hiner did not confront Merriman about the firearm until they arrived in Kentucky, at which point they "asked him for it back, and he just kind of laughed, and didn't say anything." (*Id.* at 22:16–22.) Merriman did not return the firearm and also did not return to Indiana with the Defendant and Hiner.

---

[4] The three individuals also went to a pawn shop but were unable to purchase any firearms there.

"About 3 or 4 days" after purchasing the firearms and after the road trip to Kentucky, one of the firearm sellers contacted Hiner and the Defendant to notify them that "the check was not good; that it was a closed account." (*Id.* at 16:15, 17:3–5.) At that point, the Defendant was in possession of only three of the five firearms. Merriman still possessed the one he took to Kentucky. (*Id.* at 23:17–18.) The Defendant "looked for [the other one], and [he] assumed that [Merriman] had that one also. [He] just didn't see it." (*Id.* at 23:20–21.) The Defendant and Hiner returned the three firearms to the seller but did not pay the replacement value for the two missing firearms.

## ANALYSIS

The government bears the burden to prove disputed facts and issues exist that will lead to an increase in offense level. *United States v. Knox*, 624 F.3d 865, 873 (7th Cir. 2010). Pursuant to the Commentary in U.S.S.G. §6A1.3, the preponderance of the evidence standard is the appropriate standard to resolve disputes regarding the application of the guidelines to the facts of the case. *See United States v. Lucas*, 670 F.3d 784, 792 (7th Cir. 2012) (citing *United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009)).

**A.     U.S.S.G. § 2K2.1(b)(5) – Enhancement for Trafficking**

Based upon the evidence presented at the Evidentiary Hearing and the corresponding briefs, the Court finds that the Government has not met its burden to show that the enhancement for trafficking applies in this case. According to the Commentary for U.S.S.G. § 2K2.1(b)(5), Application Note 13, the enhancement for trafficking applies if the Defendant:

> (i) transported, transferred, or otherwise disposed of two or more firearms to another individual, or received two or more firearms with the intent to transport, transfer, or otherwise dispose of firearms to another individual; and

4

      (ii) knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual

           (I) whose possession or receipt of the firearm would be unlawful; or

           (II) who intended to use or dispose of the firearm unlawfully.

The evidence does not establish by a preponderance of the evidence that the Defendant "knew or had reason to believe" that he was engaged in the trafficking of firearms. Instead, the testimony offered at the Hearing tends to show that Merriman used the Defendant and that the Defendant was unaware that Merriman was using him. Merriman's deceit was a constant theme throughout the relationship: he "sold" the Defendant a 1962 Impala that he did not own; he offered to "repay" the Defendant with a lesser amount in the form of firearms—not in cash (which he had received); he convinced the Defendant to involve Hiner in the purchase of the firearms that neither he nor the Defendant could legally purchase; he stole at least one of the firearms from the Defendant's home; and finally, he used the Defendant as a method of transportation to Kentucky.

Further, the substance of the Defendant's testimony, as well as his demeanor during the Hearing, shows that the Defendant is not an overly discerning individual and too easily trusts others. Merriman effectively swindled $2,000 from the Defendant with the car sale and then convinced the Defendant to accept repayment not only in an alternate form (firearms), but also for a lesser amount ($1,800). Defendant knew that Merriman wrote checks to the firearm sellers—if Merriman could write checks for the sale of the firearms, certainly he could satisfy his debt to the Defendant with a check. But despite such inconsistencies in Merriman's behavior, the Defendant did not insist that Merriman simply return the cash and accepted Merriman's clearly disadvantageous proposal. Moreover, the Defendant took pity on Merriman and drove him to Kentucky because Merriman claimed he did not have a car. The Defendant trusted this statement

5

despite the fact that the primary basis for his relationship with Merriman was the purchase of a car that Merriman supposedly owned. The Defendant should have questioned this discrepancy before agreeing to drive Merriman to Kentucky. Moreover, the Defendant did not suspect that Merriman had any sort of criminal history until a few weeks after the firearm seller contacted Hiner regarding the bad checks when a mutual friend hinted that Merriman had been to prison. Upon learning that Merriman's checks were bad, the Defendant returned three of the firearms but failed to confront Merriman and attempt to retrieve the remaining firearms.

The Government's evidence also shows that the Defendant is easily manipulated. His answers during the Hearing differed from his interview with ATF on April 27, 2016, in multiple ways, as demonstrated by the following exchanges on cross-examination:

> Q. Okay. When you were interviewed by ATF [on April 27, 2016], do you remember telling them that you knew that Sie had been to prison, so you assumed he was a felon about 5 minutes into the interview, so right into the interview?
>
> A. Yes.
>
> Q. You didn't tell them you found that out after the fact; you told them you knew Sie was a felon, correct?
>
> A. I told them later on in the interview that I didn't know until after all this had happened that I found that out.
>
> ***
>
> Q. Do you remember telling the officers during your interview at approximately 23 minutes into the interview that you did not know any of the firearms were missing until you got back to Fort Wayne?
>
> A. Yes.
>
> Q. Which is not what you've told us here today. Today you told us you knew on the way, correct?
>
> A. After I realized, yes.

Q. And then later you changed -- you did tell them about 24 minutes into the interview, 24 and a half, that you found out about halfway there at a gas station that he had the firearms, correct?

A. Yes.

Q. Do you remember also then telling the ATF officer approximately 25 minutes into the interview that you knew guns were in the car when you left for Kentucky?

A. After hearing it, yeah, I remember.

Q. And that about 27 minutes into the interview, you told them that Sie wanted something in return for purchasing the firearms?

A. Yeah.

***

Q. . . . I think you've told us here today that you only saw one firearm on Mr. Merriman either on the way to Kentucky or at Kentucky, correct?

A. Yes.

Q. And that it wasn't until when you got home and you got the call from the gun store that the check was written on a closed account, that you realized 2 of the firearms were missing?

A. Yes.

Q. Do you recall telling ATF that when you noticed Mr. Merriman was taking 2 of the pistols you had purchased, you asked him not to take the pistols?

A. I don't recall.

Q. You don't remember telling ATF that you knew in Kentucky at least that he had at least 2 of the firearms?

A. I knew he had one. I wasn't sure if he had another.

Q. Just the question, do you remember telling them you knew he had 2 or do you not recall saying that, or did you not say

A. I don't recall.

***

7

> Q. So is it fair to say, you didn't want guns in exchange for this loan repayment?
>
> A. Not necessarily guns. I just wanted something in return for the money I spent.
>
> Q. And so you're saying Sie wouldn't go anywhere else, he would't go to Best Buy to buy you a $2,000 t.v. or something else in exchange, that the only way he was going to repay this debt was go to a gun store and buy guns?
>
> A. That was never discussed between us.
>
> Q. But you did tell ATF that you didn't want to go buy guns, that you only did it after Mr. Merriman kept pressuring you?
>
> A. At first I didn't want you to know.

(*Id.* at 35:17–25, 37:1–21, 38:1–21, 39:7–18.) Later on in his testimony, the Defendant acknowledged that his answers changed between his interview with the ATF and at the April 19, 2017, Hearing and explained:

> Q. Okay. I don't want to beat this to death, but you've listened to the tape recording of your interview with the law enforcement officials?
>
> A. Yes.
>
> Q. And Ms. Speith has asked you some questions and would you agree that you made acknowledgments or statements to the officers that are a bit inconsistent with what you're testifying here to today?
>
> A. Yes.
>
> Q. Why is that?
>
> A. Because at the time I was nervous, scared and I felt pressured to say – or to answer the questions that they were asking in the way they wanted them answered. Because they kept telling me cooperation would be the best way to stay out of trouble.

(*Id.* at 42:14–43:3.) The Court credits the Defendant's testimony at the Hearing. The testimony shows that he does not have an intent to mislead the Court and that his inconsistent statements were due to the pressure he felt to tell the government agents

what they wanted to hear. Indeed, the portions of the PSR devoted to the Defendant's mental health and educational history are consistent with the Defendant's testimony at the Hearing and support the Court's conclusion that the Defendant is easily manipulated.

Because the Court finds that the Defendant did not "know or have reason to believe" that he was engaged in trafficking firearms with Merriman, the enhancement under U.S.S.G. § 2K2.1(b)(5) is not properly applied in this case.

**B.     U.S.S.G. § 2K2.1(b)(4)(A) – Stolen Firearms**

The Defendant argues that he did "not have any knowledge that Merriman was purchasing the firearms with checks that were written on a closed account, and there is no evidence from which such a conclusion could be drawn." (Def.'s Br. 9, ECF No. 46.) Upon learning that the checks were bad, the Defendant and Hiner attempted to return the three firearms that were in their possession—conduct in which someone who has stolen firearms is unlikely to engage. The Government argues that there is no scienter requirement for this enhancement and that because the Defendant was unable to return two of the firearms or reimburse the firearm seller, those firearms "are still considered 'stolen.'" (Gov't's Br. 15, ECF No. 47.)

Application Note 8(B) states that "Subsection (b)(4) applies regardless of whether the defendant knew or had reason to believe that the firearm was stolen . . . ." The Seventh Circuit has held that the Guidelines' drafters intended "to omit the element of *mens rea* in § 2K2.1(b)(4)," and that the omission of a scienter requirement "does not violate due process." *United States v. Schnell*, 982 F.2d 216, 220–22 (7th Cir. 1992). The evidence must only "establish by a preponderance of the evidence" that the firearm in question was stolen. *United States v. Sanchez*, 507 F.3d 532, 539 (7th Cir. 2007) (citing *United States v. Birk*, 453 F.3d 893, 899 (7th Cir. 2006)).

9

Based upon the evidence presented at the Evidentiary Hearing and the corresponding briefs, the Court finds that the Government has met its burden to show that the enhancement for the firearms being stolen applies to this case. As there is no scienter requirement for this enhancement, the Guidelines require only that the Defendant possessed a stolen firearm. Likewise, it is irrelevant whether the Defendant knew or had reason to know that Merriman wrote the bad checks. It is also irrelevant that the Defendant tried to return the firearms because his intent has no bearing on whether the firearms were "stolen." Because the firearms were "stolen" at the time that the Defendant possessed them, the enhancement under U.S.S.G. § 2K2.1(b)(4)(A) is properly applied.

## CONCLUSION

For the reasons stated above, the Defendant's objections to the PSR are SUSTAINED IN PART and OVERRULED IN PART. The United States Probation Office is DIRECTED to recalculate the PSR consistent with this Court's opinion.

SO ORDERED on August 28, 2017.

      s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT